# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CORNELIUS T. WALKER, JR., )
)
Plaintiff, )
)
v. ) C.A. No. 2022-0816-MTZ
)
FRP INVESTORS GP, LLC, )
)
Defendant. )

## MEMORANDUM OPINION

Date Submitted: October 16, 2024
Date Decided: April 15, 2025

Catherine A. Gaul, ASHBY & GEDDES, Wilmington, Delaware; Nicholas A. Casto, ICE MILLER LLP, Chicago, Illinois; Aneca E. Lasley, ICE MILLER LLP, Columbus, Ohio, *Attorneys for Plaintiff Cornelius T. Walker, Jr.*

Andrew L. Cole, Jack M. Dougherty, Nathaniel J. Klepser, Austin R. Niggebrugge, COLE SCHOTZ P.C., Wilmington, Delaware; W. Braxton Gillam, IV, MILAM HOWARD NICANDRI & GILLAM, P.A., Jacksonville, Florida, *Attorneys for Defendant FRP Investors GP, LLC.*

**ZURN, Vice Chancellor.**

This post-trial opinion concludes the general partner of a partnership breached the contractual standard for valuing newly issued partnership units, and awards damages for that breach. The plaintiff and his friends built an insurance brokerage company, then entered a lucrative partnership with a private equity sponsor. As the founding CFO, the plaintiff received incentive units allowing him to share in the company's value. The general partner had the right to issue incentive units and buy back units from departing employees. The partnership agreement required the general partner to establish a "threshold value" for newly issued units based on the general partner's reasonable determination of the company's enterprise value. New unitholders would only share in the company's growth above their units' threshold value. Existing unitholders who were not issued more units had their stakes diluted; a low threshold value would exacerbate that dilution.

The sponsor became frustrated with the plaintiff's performance as CFO and replaced him. The general partner issued the new CFO incentive units and contemplated repurchasing the plaintiff's units. But because the plaintiff's friends stuck up for him, the general partner gave him a vanity title and allowed him to retain his incentive units with almost no strings attached.

In anticipation of an acquisition, the general partner issued the remaining authorized incentive units. The plaintiff claims the general partner set the threshold value too low, repressing his share of the incentive pool in breach of the general

1

partner's contractual obligations. The plaintiff contends that when the company eventually achieved an exit and cashed out the incentive unit holders, he should have received two million dollars more than the fifty million he received.

Trial demonstrated that despite the general partner's relative generosity toward the plaintiff, it indeed breached its obligations in determining the threshold value, which harmed the plaintiff to the tune of $416,248.93.

## I.    BACKGROUND[1]

Plaintiff Cornelius T. Walker, Jr., who goes by Cory, worked in the insurance business for years alongside Charlie Lydecker and Tom Tinsley, who became his friends. In 2016, Walker formed a new insurance agency called Walker & Associates, and recruited Lydecker and Tinsley to invest as partners.[2] By late 2016, Walker & Associates had acquired two small insurance agencies and had begun interviewing private equity firms for support to launch nationwide.[3] In January 2017, Walker, Lydecker, and Tinsley partnered with private equity firm Warburg

---

[1] The facts set forth herein were proven by a preponderance of the evidence at trial. Citations in the form "[last name] Tr. —" refer to trial testimony of the referenced witness, available at docket item ("D.I.") 77, D.I. 78, D.I. 79, and D.I. 80. Citations in the form "Walker Op. Br. —" refer to Walker's post-trial opening brief, available at D.I. 73. Citations in the form "GP Ans. Br. —" refer to GP's post-trial answering brief, available at D.I. 74. Citations in the form "Walker Reply Br. —" refer to Walker's post-trial reply brief, available at D.I. 76. Citations in the form of "PTO —" refer to the parties' stipulated pre-trial order, available at D.I. 62.

[2] Walker Tr. 8–9; Lydecker Tr. 348.

[3] Lydecker Tr. 348–50; Walker Tr. 10.

2

Pincus to create a new nationwide insurance brokerage, Foundation Risk Partners Corp. ("FRP"), which purchased Walker & Associates.[4]

FRP was held by FRP Investors, L.P. (the "Partnership").[5] The Partnership's general partner was defendant FRP Investors GP, LLC ("GP").[6] FRP was created to operate a commercial insurance brokerage business and to grow both organically and through acquisitions.[7] FRP's business strategy involved acquiring other insurance agencies and integrating their administrative and agency management functions.[8] From the outset, the founders' goal was to sell FRP at a significant multiple.[9] GP and Warburg were incentivized to grow FRP as quickly as possible,[10] but FRP faced substantial competition for targets.[11]

Warburg controlled GP's board and used that power to take an active role in FRP's operations and strategy.[12] Warburg's goal was to build the business in

---

[4] Walker Tr. 10, 13–14; PTO ¶ 5; Tinsley Tr. 632. Another friend and former colleague, Benjamin Barbieri, was also a founding partner. PTO ¶ 5.

[5] PTO ¶¶ 1, 2, 5; *see* JX 5.0001.

[6] JX 3.0088; PTO ¶ 4; *see* Dimitrief Tr. 156–58.

[7] PTO ¶ 3.

[8] Dimitrief Tr. 155; Lydecker Tr. 391–92.

[9] Lydecker Tr. 392.

[10] Dimitrief Tr. 197.

[11] Walker Tr. 17.

[12] Stein Tr. 780–81 (testifying "we think of ourselves as sort of active board members in the sense that we will try to help our portfolio companies in . . . whatever capacity that we think they could be helped"); Tinsley Tr. 633 (testifying Warburg "had voting control of

partnership with the management team.[13]  It generally viewed the management team as "best in class,"[14] and it made decisions collaboratively with management.[15]  FRP's primary Warburg contacts were Jeff Stein, Warburg's head of U.S. financial services, and Michael Dimitrief,  a Warburg principal.[16]  Under Section 8.1(a) of the Partnership's limited partnership agreement (the "LPA"), GP had "full and complete discretion to manage" the Partnership's business.[17]  Section 9.1(b) provides that whenever GP makes a determination, it is "entitled to consider only such interests and factors . . . it desires."[18]

Walker, Lydecker, and Tinsley held roles at the FRP level.  Walker was FRP's first CFO.[19]  Lydecker is FRP's CEO, having held that role since the company's founding.  At all relevant times, he was on GP's board, its only member not affiliated with Warburg.[20]  He had a "collaborative relationship" with GP and served as GP's

---

the board of directors, and . . . they wanted to be aware of pretty much everything that went on within the company").

[13] Dimitrief Tr. 153.

[14] JX 79.0002.

[15] Dimitrief Tr. 240–41.

[16] PTO ¶ 7.

[17] JX 15 § 8.1(a) [hereinafter "LPA"].

[18] LPA § 9.1(b).

[19] PTO ¶ 15.

[20] *Id.* ¶ 16; Lydecker Tr. 344–45.

corporate representative at trial.[21] Tinsley is FRP's chief administrative officer, reporting to Lydecker.[22]

## A. The Partnership's Ownership Structure

The LPA provides for three ownership classes: A Units, B Units, and C Units.[23] There are two subclasses of A Units: A-1 Units and A-2 Units.[24] A-1 Units were issued to Warburg and FRP's initial management team, including Walker, Lydecker, and Tinsley.[25] A-2 Units were mainly used as currency for acquisitions.[26] B Units were meant to reward management for building FRP's enterprise value.[27] These different purposes are reflected in the units' different valuation parameters.

### 1. A-2 Units

When FRP acquired other agencies, it issued A-2 Units as part of the purchase price.[28] A-2 Units served "to entice other acquisition owners to come on board."[29]

---

[21] Lydecker Tr. 344, 354.

[22] PTO ¶ 17.

[23] *Id.* ¶ 12. The C Units are not relevant to this action.

[24] Dimitrief Tr. 161–62.

[25] *See id.* at 158.

[26] *Id.* at 161, 175.

Walker owned 398,000 A Units, which ultimately yielded him $20.4 million in proceeds when FRP achieved an exit event in August 2022. *See id.* at 214; Walker Tr. 54; JX 2.0001. Walker's A Units and associated proceeds are not at issue.

[27] Dimitrief Tr. 162, 227–28; Walker Tr. 91; Tinsley Tr. 639.

[28] PTO ¶ 27; Dimitrief Tr. 161.

[29] Walker Tr. 111–12.

The LPA placed no limitations on GP's discretion to value A-2 Units issued to targets.[30]

Since the LPA did not specify any valuation parameters, Warburg team members could "decide what they thought the value was" for A-2 Units.[31] Warburg set A-2 Unit prices quarterly "so that [it] could avoid having individual negotiations" about valuation.[32] Stein could not recall any "time when there was actually a negotiation" over A-2 Unit value.[33]

Warburg's method for quarterly valuations began with EBITDA: earnings before interest, taxes, depreciation, and amortization.[34] EBITDA is a measure of a company's "free cash flow profile."[35] Warburg's valuations started with "base EBITDA" derived from financial statements.[36] Warburg then made quality of earnings ("QoE") adjustments for nonrecurring items that affected prior-year earnings (*e.g.*, one-time severance expenses or extraordinary one-time legal fees) to

---

[30] *See* LPA § 3.2(b); *see also* Walker Tr. 19; Kleinrichert Tr. 518.

[31] *See* Stein Tr. 787.

[32] *Id.* at 785–86.

[33] *Id.* at 786. On multiple occasions, GP updated the A-2 price while Lydecker was in talks with a potential target, and the target tried to hold Lydecker to the original price. In each case, Stein "wouldn't even consider it." Lydecker Tr. 376–77.

[34] Dimitrief Tr. 185–86; PTO ¶ 32.

[35] Dimitrief Tr. 186.

[36] *See id*. at 186, 294–95.

arrive at "adjusted EBITDA."[37] Then, it made upward adjustments for (1) any future acquisition under a letter of intent ("LOI")[38] and (2) the projected annual results of mid-year acquisitions.[39] These adjustments, loosely called "LOI credit," yielded "adjusted pro forma EBITDA."[40] Finally, Warburg calculated enterprise value by applying a multiple, based on transactions involving comparable companies, to adjusted pro forma EBITDA.[41]

---

[37] *See id*. at 186–87; JX 93 at Tab "1221 adjusted (JL QE 12.16.21)"; LaRubbio Tr. 716–17. For FRP, these adjustments focus on nonrecurring expenses. *See* Dimitrief Tr. 186–87. Such expenses are not indicative of a company's true earning potential. *See id*. If FRP failed to account for these items, the EBITDA metric would not be an accurate representation of the "potential cash flow profile of the business." *See id*.

[38] Acquisitions boosted FRP's cash flow. *See id.* at 192, 194. Warburg made "LOI credit" adjustments to reflect the corresponding boost to "EBITDA from future acquisitions." Stein Tr. 758–59, 804–06, 812; *see* Dimitrief Tr. 192, 194; JX 175 at Tab "Unit Valuation Summaries 2021," Cell M30; JX 184 at Tab "2021,2022 Equity Valuation," Cell J9.

Since the company has not paid for targets still under LOI, any positive LOI credit for future acquisitions has an associated negative purchase price adjustment. *See id.* at Tab "2021,2022 Equity Valuation," Cell J16; *cf.* Leonard Tr. 740. FRP accounts for that adjustment as an increase in debt when converting from enterprise value to equity value. *See* JX 184 at "2021,2022 Equity Valuation," Cell J16.

[39] *See* Dimitrief Tr. 186–87 ("To give an example of what that means, let's presuppose [FRP] made an acquisition on December 31 of a specific year. You would have one day . . . that actually show[s] up in the reported EBITDA of that business. In order to actually show what the . . . potential of the business is, you need to annualize the performance of that acquisition. So one of the key adjustments made to EBITDA was to annualize the performance of acquisitions made during a particular year.").

[40] *See, e.g.*, JX 184 at Tab "2021,2022 Equity Valuation," Cell J10; Dimitrief Tr. 192, 194–95.

[41] *See* Dimitrief Tr. 187–88; JX 175 at Tab "Unit Valuation Summaries 2021," Cell M35.

## 2. B Units

B Units allowed unitholders to participate in value creation above the point at which they were issued.[42] The LPA authorized 3,000,000 B Units, which GP could issue at its discretion.[43] Warburg viewed B Units as a management incentive plan or "sweat equity."[44] They were meant to align the management team's interests with Warburg's.[45] Newly issued B Units were assigned a "Threshold Value" based on FRP's enterprise value, which rewarded unitholders based on the company's growth during the period they held units.[46] As FRP's enterprise value grew, so did the amount that would be paid to B Unit holders in the event of an acquisition, called the "B Pool."[47]

The LPA specified that B Units were to constitute "Profits Interests," defined as equity units that are "classified as [] profits interest[s] within the meaning of

---

[42] Dimitrief Tr. 230; LPA § 3.2(c)(iii).

[43] LPA §§ 3.2(a), (c)(i); Walker Tr. 91.

[44] Dimitrief Tr. 162.

[45] *Id.*

[46] *See* Walker Tr. 91 ("Q. You do agree with me that the point of the B units were to reward people on a go-forward basis; right? A. Yes, that is my understanding."); Dimitrief Tr. 227–28; Tinsley Tr. 639 ("Q. [T]he point is to compensate the holder for growth in the company during the time period that they were held; is that fair? . . . . A. Yeah. It's to compensate individuals for their role in growing the company.").

[47] *See* LPA § 6.1(c); GP Ans. Br. 4 n.1; Walker Op. Br. 16–18.

8

Internal Revenue Service Revenue Procedures 93-27 and 2001-43."[48]   Those

revenue procedures explain that profits interests are intended to compensate for

future growth, and should not offer any standalone value at the time of issuance.[49]

Warburg's principals testified similarly:  profits interests are not taxed upon receipt,

as they have no standalone value at that time, but rather are taxed when the

unitholder "realizes" a gain.[50]  Accordingly, when issuing profits interests, "you'd

---

[48] LPA § 3.2(c)(iii), Ex. A; *see* Rev. Proc. 93-27, 1993-2 C.B. 343; Rev. Proc. 2001-43, 2001-2 C.B. 191.  The Court takes judicial notice of these procedures as duly published regulations of an agency of the United States.  D.R.E. 201(d)(1)(B); *see also People With Disabilities Found. v. Colvin*, 2016 WL 2984898, at *3 (N.D. Cal. May 24, 2016).

[49] Revenue Procedure 93-27 defines a profits interest as "a partnership interest other than a capital interest."  Rev. Proc. 93-27, § 2, 1992-2 C.B. 343.  It defines a capital interest as "an interest that would give the holder a share of the proceeds if the partnership's assets were sold at fair market value and then the proceeds were distributed in a complete liquidation of the partnership," and notes "[t]his determination generally is made at the time of receipt of the partnership interest."  *Id.*  Receipt of a capital interest "is taxable as compensation."  *Id.* § 3.  But "if a person receives a profits interest for the provision of services to or for the benefit of a partnership in a partner capacity or in anticipation of being a partner, the Internal Revenue Service will not treat the receipt of such an interest as a taxable event." *Id.* § 4 (noting exceptions if (1) "the profits interest relates to a substantially certain and predictable stream of income from partnership assets, such as income from high-quality debt securities or a high-quality net lease," (2) "within two years of receipt, the partner disposes of the profits interest," or (3) "the profits interest is a limited partnership interest in a 'publicly traded partnership'").

[50] *See* Dimitrief Tr. 227; Tinsley Tr. 638–39 (agreeing the idea with profits interests "is you hold them from the time when they're assigned, and the threshold value is what the value of the company is at that point when they're issued").  Stein testified:

> [I]f you were to . . . issue units to someone at [] below the value . . . of the
> company at that time, that would be as if you were giving value to someone.
> And the problem is if you . . . give day one value to someone, then that is . .
> . a taxable event. . . .  So in any company when you issue . . . profit units, you

want to do your best to value [them] in line with what you thought the value of the company was at that time."[51] Stein reiterated that "if you received new units at a value that was too low, you'd essentially be getting credit for value that was created before" the issuance.[52]

To effectuate the B Units' purpose as Profits Interests, Section 3.2(c)(iii) provides that GP must set a Threshold Value for newly issued B Units "to the extent necessary to cause such . . . B Units to constitute Profits Interests."[53] Section 3.2(c)(iii) sets forth the requirements for establishing the Threshold Value:

> The Threshold Value . . . shall equal the amount that would, in the reasonable determination of [GP], be distributed pursuant to Section 6.1 with respect to each then outstanding [B] Unit if, immediately prior to the issuance . . . the assets of the Partnership were sold for their Fair Market Values, and the proceeds were used to satisfy all liabilities of

---

want to do it . . . with a benchmark value such that it is being . . . valued at the valuation of the company at that time.

Stein Tr. 791.

[51] Stein Tr. 792; *see also* Lydecker Tr. 399 ("Q. Now, the threshold value determination, that is supposed to represent what the value is of the B units at the time that the additional outstanding units were reissued in February; correct? A. Correct."); Walker Tr. 65 ("Q. Do you agree with me that the purpose of the B pool, the B units, was to incentivize the management team to work hard to grow the company? A. To grow the company from that point in time, yes."); *id.* at 55 ("[T]he purpose of the B pool and establishing the fair value is to reward people from where the fair market value is on a go-forward basis, and it's not to pay for previous services."); Tinsley Tr. 639 ("Q. [T]he point is to compensate the holder for growth in the company during the time period that they were held; is that fair? . . . . A. Yeah. It's to compensate individuals for their role in growing the company.").

[52] Stein Tr. 792 (noting that setting the valuation too high would also be problematic).

[53] LPA § 3.2(c)(iii).

the Partnership . . . and any excess proceeds were distributed pursuant to Section 6.1.[54]

In setting the Threshold Value, GP must make a "reasonable determination" of the amount that would be distributed to the B Unit holders pursuant to Section 6.1 if "immediately prior to the issuance," the Partnership's assets were sold for their "Fair Market Values."[55]  The LPA defines "Fair Market Value" as "a determination reasonably made by [GP] of the cash value of specified asset(s) that would be obtained in a negotiated, arm's length transaction between an informed and willing buyer and an informed and willing seller."[56]  The definition also states that "[a] determination of Fair Market Value by [GP] shall be final and binding for all purposes of this Agreement."[57]

The preponderance of the evidence establishes that the "value of the Partnership's assets" is conceptually the same as "FRP's enterprise value." Dimitrief's testimony regarding a Partnership organization chart indicates the organization's assets—primarily acquired companies—sat at the FRP level.[58]  At

---

[54] *Id.*

[55] *Id.*

[56] *Id.* Ex. A.

[57] *Id.*

[58] *See* Dimitrief Tr. 156–58; JX 7.0004; *see also* Walker Tr. 64 ("[W]e had FRP Corporation, which was 100 percent owned by a parent company and that was owned 100 percent by . . . a parent company, which was 100 percent owned by the [] partnership . . . but there was never -- the financial statements that we prepared on -- on the operating

11

times, both parties' briefs as well as witnesses refer to the determination required under Section 3.2(c)(iii) as a determination of FRP's enterprise value.[59]

In practice, Warburg used its preceding quarterly valuation to value both A-2 Units and B Units.[60] When Warburg issued B Units to FRP's new CFO in early October 2020, it used its quarterly valuation from September 30.[61] At trial, Warburg professed it employed this practice out of adherence to the "law of one price," which its brief describes as "the use of the same enterprise value to calculate unit price for all contemporaneously issued classes of units."[62] According to Dimitrief, Warburg had "definitionally . . . calculated the threshold value" via the most recent quarterly valuation under the "law of one price."[63] He testified that under the "law of one price," "[w]hen you issue one class of units, you're definitionally setting the price and, in this case, the threshold value of the other."[64] Dimitrief took the position that the principle compelled GP to use the previous quarterly valuation to value B Units

---

company was FRP, and that's why we refer to everything [as] "FRP." The others is just an organizational structure.").

[59] *See, e.g.*, Walker Op. Br. 15, 32, 54; GP Ans. Br. 12–13, 54, 57–58, 60; Dimitrief Tr. 340–41; Kleinrichert Tr. 415, 418; Beach Tr. 526.

[60] Stein Tr. 793, 796–97, 810; *see also* Dimitrief Tr. 298–99.

[61] *See* Stein Tr. 793, 796–97, 810; JX 24 at Tab "B-1 Tier Levels (not complete)" (displaying hypothetical B Pools based on different assumptions about a "9/30/20 Valuation").

[62] GP Ans. Br. 17; Dimitrief Tr. 168, 288–91, 298–99.

[63] Dimitrief Tr. 289–90.

[64] *Id.* at 298–99.

regardless of when during the quarter the units were issued.[65]  In his view, the "law of one price" required that equity issuances during the same quarter apply the same valuation even when the issuances were not close in time.[66]

### 3. Distributions To Unitholders

Two frameworks govern what unitholders receive in an exit event.  First, LPA Section 6.1(c) specifies a waterfall for distributing Partnership assets.[67]  Its starting point is equity value, which equals enterprise value minus net debt.[68]  The waterfall

---

[65] *See id.* at 168, 288–91, 298–99 ("[I]f we had, for whatever reason, dictated a specific threshold value that was either higher or lower than what we had determined in this valuation process, the issue becomes you are actually issuing equity at two different prices. Again, B units are just a form of equity.  They have a price.  A-2 units are implied by that same valuation.  So definitionally, we would have been issuing equity to two different classes of units at different prices, which violates, effectively, every law of corporate finance . . . .").

[66] *See id.* at 289–90 ("Q. But fair to say, too, though, if you had this valuation from which you're going to work to determine threshold value, as you're required to do under the partnership agreement, nothing would have prevented you from updating . . . to reflect additional information that you had in hand at the time; right?  A. I think it depends on your view of when the process to start the threshold valuation process began . . . . But I think as part of this, and again thinking about why the law of one price is important, I think our perspective was definitionally we had calculated the threshold value by doing this exercise. We had calculated the value of the B units under the waterfall in our regular process.").

[67] LPA § 6.1(c).

[68] Dimitrief Tr. 189–90; *see Enhabit, Inc. v. Nautic P'rs IX, L.P.*, 2024 WL 4929729, at *39 (Del. Ch. Dec. 2, 2024).

In FRP's case, equity value is derived from enterprise value by adjusting for cash on the balance sheet, debt, net present value of earnout liabilities, purchase price for deals under LOI, loan repayments due from certain equity holders, and bonus payments due to certain synthetic equity holders.  Dimitrief Tr. 189–90, 195–96; JX 184 at Tab "2021,2022 Equity Valuation."

13

establishes A-1 Unit distributions, A-2 Unit distributions, and aggregate B Unit distributions called the "B Pool."[69]

The parties' dispute concerns the second framework: distributions within the B Pool. The B Pool is divided into tiers based on the Threshold Value set for each B Unit issuance. When GP issues new B Units, the associated Threshold Value defines the endpoint of one tier and the starting point of the next tier.[70] Each successive issuance creates a new tier until an exit event establishes the total size of the B Pool, and the endpoint of the final tier.[71] The amount of proceeds available to B Unit holders in a given tier is the difference between the tier's starting and ending points.[72] B Unit holders receive distributions from a given tier in proportion to their share of outstanding units at the start of that tier.[73]

A low Threshold Value for a new issuance shifts value away from existing B Unit holders that do not receive additional units in the issuance. The issuance dilutes

---

[69] Dimitrief Tr. 165–66; Leonard Tr. 729; *see also* GP Ans. Br. 4 n.1.

[70] *See* Walker Tr. 34, 43–46, 53; Tinsley Tr. 675–76; *see also* Walker Op. Br. 16–18; GP Ans. Br. 39–40.

[71] *See* Walker Tr. 53–54; Tinsley Tr. 675–76; Dimitrief Tr. 230; *see also* Walker Op. Br. 16–18; GP Ans. Br. 39–40.

[72] Walker Tr. 105; *see also* Walker Op. Br. 16–18; GP Ans. Br. 39–40.

[73] *See* Walker Tr. 34, 43–46, 53; *see also* Walker Op. Br. 16–18; GP Ans. Br. 39–40.

the unitholder's stake in the new tier, and the low Threshold Value starts the new tier earlier so the unitholder's stake is diluted earlier in the B Pool distribution.[74]

## B. Walker Is Forced To Step Down As CFO, But Keeps His Equity Units.

Walker received 360,000 B Units at a $0 Threshold Value through a restricted unit agreement ("RUA") dated January 31, 2017.[75]  A total of 2,297,300 B Units were issued at a $0 Threshold Value.[76]  At some point in 2018 or 2019, Warburg and GP began to question Walker's "ability to perform the CFO job in a demanding private-equity-backed company."[77]  He could not articulate financial performance information in a way Warburg could understand, and Warburg doubted whether he "understood the true health of the business" and "how acquisitions . . . were performing."[78]  Nor could he adequately deliver performance information to lenders.[79]  Dimitrief "oftentimes had to field messages of concern from [] lenders that the CFO was not up to the task."[80]  Warburg was concerned Walker did not

---

[74] *Cf.* Walker Tr. 64–65.

[75] PTO ¶¶ 22–24; JX 5.0001.

[76] Walker Op. Br. 56; GP Ans. Br. 38; *see* JX 88; JX 89.0002; Tinsley Tr. 674; Walker Tr. 35, 92–93; *cf.* JX 141 § 3(a).

[77] *See* Dimitrief Tr. 180; Lydecker Tr. 356.

[78] Dimitrief Tr. 180.

[79] *Id*. at 181.

[80] *Id*.

understand the valuation process or fundamental private equity accounting practices.[81]

After a 2019 board meeting, Warburg told Lydecker that Walker was "not going to cut it" because he was "too tedious in the numbers and he can't tell [FRP's] story."[82] It was "too difficult to extract information" from his presentations.[83] Lydecker understood those concerns but stuck up for Walker as his friend and asked Warburg for time to create a "remediation plan."[84] But those efforts did not satisfy Warburg's concerns, and in October 2020, Lydecker told Walker that Jeff Leonard would be replacing him as CFO.[85] Lydecker offered Walker the position of FRP's vice chairman, with the new CFO reporting to him, but Walker declined.[86]

Then FRP issued new B Units to Leonard, creating a new B Unit tier. On October 8, Leonard executed an RUA granting him 90,000 B Units with a $16.8 million Threshold Value.[87] GP set the Threshold Value based on the previous

---

[81] *Id.*

[82] Lydecker Tr. 356–57.

[83] *See id.* at 357.

[84] *See id.* at 357–58.

[85] *Id.* at 363–64; Walker Tr. 23.

[86] Lydecker Tr. 364–65.

[87] Walker Tr. 34; *see* Walker Op. Br. 16; GP Ans. Br. 39. After the Leonard issuance, 612,700 authorized B Units remained unissued. *See* LPA § 3.2(a).

16

quarterly valuation from September 30.[88]  This set the upper bound for the first B

Pool tier—reserving $16.8 million of B Pool proceeds for first-tier unitholders—and

established the starting point for the second tier.  Walker was not aware Leonard

received B Units or that GP assigned them a $16.8 million Threshold Value until at

least December 2021.[89]  The Leonard issuance was "the only time there was a

threshold determination made"[90] before the final February 2022 determination at

issue.

If Walker had left the company under his original employment agreement,

either voluntarily or by termination, GP could have repurchased all of his equity

---

[88] *See* Stein Tr. 793, 796–97, 810; JX 24 at Tab "B-1 Tier Levels (not complete)."

[89] Walker Tr. 30–31, 100–01 (testifying the first time he heard about Leonard's units was during a meeting with Tinsley in December 2021 or January 2022); *id*. at 103 ("I didn't even realize that threshold value was set at 16.8 until we started getting into this lawsuit and getting documents from the company.").

[90] *Id*. at 93.

The parties appear to agree GP did not make a "threshold determination" for B Units issued at a $0 Threshold Value.  *See id*. at 93–94 (asking Walker to confirm on cross-examination that "the only time there was a threshold determination made other than the one that you're complaining about in this lawsuit was when Mr. Leonard came on in October of 2020"); D.I. 85 (noting that "since the company started, there were only two instances of setting threshold values," *i.e.*, October 2020 and February 2022); *see also* Walker Tr. 13 ("[A]t the initial start date, I received 360,000 units . . . that were valued at zero because there was no operation."); *id*. at 34–35 ("[A]ll all the time I was ever there, there was never any B units issued, so there was never a threshold.  But on subsequent information, I found out that they had issued 90,000 shares to the new CFO after I stepped down, and they had assigned a threshold value of $16.8 million.").  Neither party's post-trial briefing suggests GP made a Threshold Value determination before the Leonard issuance.

17

units.[91]   Lydecker supported Walker keeping his A Units but "thought it was super unreasonable" for him to keep his B Units because he was not expected to contribute meaningfully to the company's growth.[92]   Tinsley, who had a close personal relationship with Walker, persuaded Lydecker to allow Walker to retain his B Units.[93]

And so, the same day Leonard signed his RUA, Walker signed an amended employment agreement that made him FRP's executive vice president and allowed him to retain his A and B Units.[94]   The amended agreement did not require Walker to provide any day-to-day services for FRP, stating he "shall only take on projects and otherwise provide services consistent with [his] stated intention to work toward retirement."[95]   Walker was the only FRP employee "allowed to stop providing day-to-day services for the business and keep his A or B units."[96]   If GP had exercised its repurchase rights, Walker would have received $9.7 million for his remaining units; as it happened, he received $50.7 million.[97]

---

[91] Walker Tr. 72–73; *see* RUA §§ 5(b), (f); LPA § 3.10; JX 4 § 6(d).

[92] *See* Lydecker Tr. 365, 389.

[93] *Id*. at 360, 365–66, 389–90.

[94] PTO ¶¶ 28–31; JX 22.

[95] JX 22.0001; Walker Tr. 88, 94.

[96] Walker Tr. 88.

[97] Dimitrief Tr. 214; *see* JX 2.0001 (showing approximately $30.3 million for B Unit proceeds and $20.4 million for A Unit proceeds).

## C. The December 31 Valuation

On December 31, 2021, Warburg performed its quarterly valuation (the "December 31 Valuation" or the "Valuation").[98] The Valuation starts with $105.5 million in base EBITDA based on last twelve months ("LTM") EBITDA as of November 31.[99] Then it adjusts for December to reach approximately $118 million in EBITDA.[100] It then adds $4.3 million in QoE adjustments[101] and $8.7 million in LOI credit to reach $131.1 million in adjusted pro forma EBITDA.[102] Finally, it applies a 16x multiple for an enterprise value of $2.098 billion.[103] Warburg

---

[98] JX 175 at Tab "Unit Valuation Summaries 2021," Column M; Dimitrief Tr. 318.

[99] JX 175 at Tab "Unit Valuation Summaries 2021," Column M.

[100] *See id.* at Tab "Unit Valuation Summaries 2021," Cells M9, M28, M29; Dimitrief Tr. 318–19.

[101] *See* JX 175 at Tab "Unit Valuation Summaries 2021," Cells M11, M16, M18; Dimitrief Tr. 194–95, 318–19.

[102] JX 175 at Tab "Unit Valuation Summaries 2021," Cells M30, M34; Dimitrief Tr. 194–95; 318–19. The December 31 Valuation refers to this as "adjusted EBITDA," but the figure includes "acquisitions under LOI at the time," meaning it represents adjusted pro forma EBITDA as the parties have used that term. *See* JX 265 at "Summary Prepared 10.6.22," Cell Z32; JX 175 at Tab "Unit Valuation Summaries 2021," Cell M30; Dimitrief Tr. 194–95; *cf.* Leonard Tr. 721–22 (testifying that to calculate "adjusted LTM EBITDA" for quarterly valuations, "[g]enerally speaking, we would take our actual LTM EBITDA, pro forma in the acquisitions that weren't in your LTM period, plus or minus any other adjustments").

[103] JX 175 at Tab "Unit Valuation Summaries 2021," Cells M35–M36; Dimitrief Tr. 193–94.

19

subtracted net debt to get equity value, ran that through the distribution waterfall, and concluded the December 31 Valuation implied a B Pool of $110.7 million.[104]

### D. TA Expresses Interest In Acquiring FRP.

FRP continued its strategy of growth by acquisition in a hot market. The market was so hot that FRP was also a target. Warburg originally "planned to run a sale process for [FRP] at the end of 2022."[105] But in December 2021, private equity firm TA Associates Management, L.P. verbally expressed interest in acquiring FRP for $2.55 billion, purportedly an 18x multiple over $141.7 million in adjusted pro forma EBITDA.[106] Warburg concluded TA's bid implied $119 million in base EBITDA, $2.8 million in QoE adjustments, and $19.8 million in LOI credit.[107]

Lydecker and his friends were excited. Lydecker had "heard 18x+ type numbers thrown around" by other private equity players, and thought TA's bid left "too much on the table."[108] He believed FRP's "exciting pipeline" could enable the

---

[104] JX 175 at Tab "Unit Valuation Summaries 2021," Cells M36–M49; *see* Dimitrief Tr. 189–90.

[105] JX 270.002.

[106] *See* JX 188.0006 (noting details of "TA's original verbal offer"); JX 158.0001; Dimitrief Tr. 210–11.

[107] *See* JX 158.0001; JX 188.0006.

[108] JX 260; *see* Stein Tr. 803–04.

business to "hit $180mm in EBITDA for 2022."[109] Lydecker's goal was a 5x multiple on invested capital ("MOIC").[110]

Warburg was cooler on TA's bid. Warburg believed TA was interested in acquiring FRP but concluded the multiple was not "serious," as TA's EBITDA view gave little credit for Warburg's internally identified adjustments.[111] Warburg viewed an 18x multiple applied to fully adjusted EBITDA "as above a fair market multiple."[112] It viewed TA's offer as a preemptive bid, *i.e.*, an above-market bid aimed at gaining exclusivity in negotiations.[113] Warburg also believed it was entitled to more QoE adjustments than TA had included,[114] and was ready to end negotiations over the shortfall.[115]

On December 20, Dimitrief circulated an executive summary of Warburg's perspective on TA's proposal.[116] That summary shares a preliminary set of QoE and LOI credit adjustments Leonard had identified, which led to roughly $145 million

---

[109] JX 81.

[110] Lydecker Tr. 392, 407.

[111] Dimitrief Tr. 211. TA director Clara Jackson testified the 18x multiple was "not [on] a fully adjusted EBITDA number." D.I. 61, Jackson Dep. 121.

[112] *See* Dimitrief Tr. 277–78.

[113] *See* JX 99.0002; D.I. 61, Jackson Dep. 127; Dimitrief Tr. 207–08, 211, 244–45, 277.

[114] *See* Dimitrief Tr. 211, 248.

[115] *See* JX 152.0001.

[116] JX 99.0002.

in adjusted pro forma EBITDA.[117] Leonard believed those numbers were in line with the market.[118] The summary also notes Warburg engaged accounting firm Ernst & Young to perform a "lite" QoE report to confirm Leonard's numbers.[119]

### E. FRP And Warburg Contemplate Diluting Walker's Stake In The Remainder Of The B Pool.

With stars in their eyes from TA's initial proposal, FRP's management team began calculating their payouts. They focused on what Walker would take for the B Units he had been allowed to keep.[120] They contemplated issuing the Partnership's remaining B units to recipients other than Walker, which would dilute Walker's take from the B Pool above that issuance's Threshold Value.[121] The lower they set the Threshold Value, the more Walker would be diluted.[122]

On December 17, Tinsley emailed Lydecker a "B Units allocation template" spreadsheet he created "for discussion."[123] It compared Walker's take with and

---

[117] *Id.*; *see* JX 93 at Tab "1221 adjusted (JL QE 12.16.21)"; Leonard Tr. 733–34.

[118] *See* Leonard Tr. 745; JX 99.0002; JX 93 at Tab "1221 adjusted (JL QE 12.16.21)."

[119] JX 99.0005. The purpose of a "lite" QoE "is to come up with a list of possible adjustments that could be made to EBITDA," without paying for a full QoE. *See* Dimitrief Tr. 248; Leonard Tr. 757.

[120] *See* JX 89.0001; JX 88; Tinsley Tr. 654–55.

[121] *See* JX 89.0001; JX 88; Tinsley Tr. 654–55.

[122] *See* LPA § 6.1(c); Walker Tr. 34, 43–46, 53–54, 105; Tinsley Tr. 675–76; Dimitrief Tr. 230; *see also* Walker Op. Br. 16–18; GP Ans. Br. 39–40.

[123] JX 89.0001; JX 88; Tinsley Tr. 654.

without a new B Unit issuance:  a new issuance would redirect $8 million to other B Unit holders, with individual increases between $9,000 and $2.4 million.[124]

Two days later, Tinsley emailed FRP's general counsel Tom Leek, stating,

Tom, I didn't see your text from this morning until later.  The second attachment above should answer your questions.  The first attachment is the latest version of our calculations showing if we wait ~9 months and take our adjusted EBITDA from $144.8mm to $175.6mm, the B Pool grows from $208.24mm to $267.26mm (see columns M and N).  I have some new thoughts on how to treat Cory's situation.  Happy to talk anytime.  This is fun!  Thanks.[125]

The second attachment is a spreadsheet titled "Leek Exit Estimates."[126]  It includes cells labeled "B Units under one Cory assumption" and "B Units under another Cory assumption."[127]    Tinsley testified he did not remember what assumptions the spreadsheet was referencing but acknowledged the "Cory assumptions" referred to Walker.[128]

On December 28, Dimitrief made a note to himself to "look into b units frozen."[129]  According to Dimitrief, freezing units generally refers to "a process whereby the value of the shares is frozen so that it cannot grow further, and a new

---

[124] JX 88; Tinsley Tr. 655.

[125] JX 92.

[126] *Id.*; JX 94.

[127] JX 94.

[128] Tinsley Tr. 666–67.

[129] JX 103.

class of shares is created that will then benefit from future growth."[130] The next day, Dimitrief responded to an email from Stein noting Leek had been looped in about "the B Unit concept."[131] In January 2022, he spoke to outside counsel "to understand [Walker's] employment agreement."[132]

By this point, Walker knew GP was planning to issue the remaining B Units.[133] Tinsley approached Walker about amending his employment agreement to freeze his units, while setting a minimum floor for what he would receive regardless of any additional issuance.[134] Walker took from that conversation that Warburg had told management the B Pool might not meet their expectations and that they "all would have gotten more" if management had let Warburg repurchase Walker's units when he was ousted as CFO.[135]

On February 5, 2022, Tinsley emailed Walker a draft amended employment agreement proposing to limit Walker's compensation for his B Units to 12% of the B Pool after the first tier (much like Tinsley's December 17 spreadsheet) and

---

[130] Dimitrief Tr. 256–57.

[131] *See* JX 105.

[132] Dimitrief Tr. 262, 266–67. At some point Dimitrief had also investigated Warburg's right to repurchase Walker's B Units. *Id*. at 266–67.

[133] Tinsley Tr. 677–78.

[134] Walker Tr. 31, 39–40; Tinsley Tr. 670–73; *see also* JX 124; JX 126.

[135] Walker Tr. 37–38.

providing a $30 million floor.[136] Walker would not be paid directly from the B Pool as a typical unitholder. Instead, he would receive compensation "in full and complete satisfaction" of his rights as a B Unit holder.[137] And the value of his B Units would be frozen at $30 million as long as the B Pool remained under $245 million.[138] Walker refused those terms.[139]

### F. Warburg's Grills Model

By February 11, Warburg had developed an updated view of adjusted pro forma EBITDA aided by Ernst & Young's QoE analysis, and communicated its updated view to TA.[140] This time, Warburg started with $119 million in base EBITDA.[141] From there, it added $28.1 million in QoE adjustments to reach $147.1 million in adjusted EBITDA, and another $14.5 million in LOI credit to reach $161.6 million in adjusted pro forma EBITDA.[142] FRP management was on board with that

---

[136] JX 141 §§ 3(a)–(b). Tinsley initially sent an incomplete draft of the employment agreement on January 26. JX 126; JX 124.

[137] JX 141 § 3(b).

[138] *See* Walker Op. Br. 24.

[139] Walker Tr. 42.

[140] *See* Dimitrief Tr. 249; JX 130; Beach Tr. 609; *see also* JX 182.0002; JX 148.0002.

[141] *See* JX 182.0002; JX 148.0002.

[142] *See* JX 182.0002; JX 148.0002.

base EBIDTA and those adjustments.[143]  Warburg also had a set of QoE adjustments called its "least aggressive" adjustments that totaled about $12.3 million.[144]

The same day, Warburg realized the $14.5 million LOI credit adjustment was outdated.[145]  Deals that were not yet subject to an LOI were counted prematurely: those deals had only been included in the context of the TA bid because they might be under LOI by the time a deal closed.[146]  The LOI credit adjustment also included a  deal that had actually died.[147]  The more accurate LOI credit adjustment was $6.3 million.[148]  Applying that $6.3 million LOI credit adjustment alongside Warburg's "least aggressive" $12.3 million in QoE adjustments would yield $137.6 million in adjusted pro forma EBIDTA.[149]  A 16x multiple would put enterprise value at $2.202 billion.

---

[143] *See* Leonard Tr. 757–58.

[144] JX 182.0001–02 (referring to a list of "less aggressive" adjustments totaling about $12.3 million as Dimitrief's "moderate view" of adjustments); *see* JX 189.0004 (calling the adjustments Warburg's "least aggressive" adjustments).  Stein and Dimitrief referred to this moderate total as $12.4 million.  JX 182.0002; JX 189.0004.  They rounded the adjustments in the list before adding them up, causing a rounding error.  *See* JX 184 at Tab "Imp. Multiples & Adjustments," Cells G11, G17, G23, G27, G28, G29 (showing the adjustments sum to $12.339 million).

[145] *See* JX 182.0002–03; *see also* JX 154.0002.

[146] Stein Tr. 805–06.

[147] *See* JX 182.0002–03; 154.0002.

[148] *See* JX 150.0002–03; JX 182.0002–03; JX 183.0002; JX 184 at Tab "2021,2022 Equity Valuation," Cells Z10–Z12, Z15.

[149] *See* JX 182.0002; JX 189.0004.

Around February 14, Warburg told TA that TA's $2.8 million in QoE adjustments were inadequate and shared its own perspective on the adjustments.[150] TA wanted to think through Warburg's numbers and said it would send a revised written proposal soon.[151]

Then TA "upped their bid to $2.7bn, assuming $19mm in LOIs."[152] TA's LOI credit adjustment included two dead deals.[153] Warburg considered the bid in light of its "least aggressive" adjustments and adjusted to back out the dead deals: the bid valued FRP at $2.53 billion with a multiple of just under 18x.[154]

On February 26, Warburg drilled down on the multiple using its "Grills model."[155] The Grills model was "an internal Warburg Pincus concept" that represented Warburg's "best guess" about FRP's future.[156] It was unique to Warburg.[157] In the past, Warburg had used the Grills model to "check [the] math" on its analysis of B Unit distributions using non-Grills assumptions to "make sure"

---

[150] *See* JX 152.0001.

[151] *Id.*

[152] JX 189.0004.

[153] JX 183.0002.

[154] JX 189.0004–06.

[155] *See generally* JX 183; JX 184.

[156] Dimitrief Tr. 303, 339.

[157] *See id*. at 303, 308, 339; Stein Tr. 801–02; JX 104.0001; JX 114.0002.

it got "to a similar place."[158] Warburg used the Grills model to calculate the multiple implied by TA's $2.53 billion bid assuming $119 million in base EBITDA and $10.3 million in LOI credit ($6.3 million for deals with LOIs in place, and $4 million for deals without LOIs that might be under LOI by the time a deal was done).[159] Warburg ran the model on three different levels of QoE adjustments, called "no-brainer adjustments" ($6.4 million), "moderate adjustments" ($13.4 million), and "all adjustments" ($28 million).[160] The "moderate adjustments" were very close to what Warburg had called the "least aggressive" adjustments; Warburg appears to have added a $1.1 million adjustment for "2021 Net New Business Adjustment" for the moderate adjustments.[161]

---

[158] *See* JX 104.0001.

[159] JX 183.0003; JX 184 at Tab "2021,2022 Equity Valuation," Cells Z10–Z19.

[160] JX 183.0003.

[161] On February 25, Dimitrief forwarded a February 11 list of adjustments totaling $12.3 million to a Warburg analyst. JX 182.0001–02. Dimitrief's February 25 email stated, "Here is my view on moderate adjustments. You can easily figure out the no brainers and the whole load. Let's put together the returns to [Warburg] based on TA's bid with these three sets of adjustment buckets." *Id*. The same day, Stein referred to the same set of adjustments as Warburg's "least aggressive" QoEs. JX 189.0004.

The February 11 list specified the following adjustments: (1) "$2.4mm unvalidated producer add-back," (2) "$3.6mm wholesaler optimization," (3) "$2.7mm RIFs," (4) "$0.3mm PTO catchup," (5) "$2.4mm out of period CSG adjustment," (6) "$1.0mm FRP NY adjustment." JX 182.0002. The Grills model's moderate adjustments contain each item on the February 11 list, plus $1.1 million for "2021 Net New Business Adjustment." JX 184 at Tab "Imp. Multiples & Adjustments," Column G; *see* JX 182.0002; *see also* Dimitrief Tr. 192–95, 293–94; Leonard Tr. 741–42.

The Grills model generated three outputs for adjusted pro forma EBITDA: no-brainer adjustments led to $135.7 million, moderate adjustments led to $142.7 million, and all adjustments led to $157.3 million.[162]   Warburg then found the multiples to get from those adjusted pro forma EBITDA figures to TA's $2.53 billion valuation:  18.6x, 17.7x, and 16.1x, respectively.[163]

From there, Warburg used the Grills model to calculate the B Pool under each level of adjusted pro forma EBITDA using the 18x multiple from TA's initial verbal offer.   The B Pool is labeled "Management B" at the bottom of the following graphic[164]:

| ($ in millions) | No-Brainer Adjustments | Moderate Adjustments | All Adjustments |
|---|---|---|---|
| **Valuation** | | | |
| Base EBITDA | $119.0 | $119.0 | $119.0 |
| (+) QoE Adjustment | $6.4 | $13.4 | $28.0 |
| (+) 2022 LOI Credit | $10.3 | $10.3 | $10.3 |
| **Total Adjusted PF EBITDA** | $135.7 | $142.7 | $157.3 |
| Exit Multiple | 18.0x | 18.0x | 18.0x |
| **Total Enterprise Value** | $2,442.0 | $2,569.3 | $2,831.1 |
| (+) Cash | 21.4 | 21.4 | 21.4 |
| (-) Debt | (939.4) | (939.4) | (939.4) |
| (-) Earnouts | (111.5) | (111.5) | (111.5) |
| (-) Purchase Price Deduct for Deals under LOI | (107.7) | (107.7) | (107.7) |
| (+) Producer A-2 Loan Repayment | 6.6 | 6.6 | 6.6 |
| (-) Producer A-3 Sales Incentive Bonus Payment | (3.9) | (3.9) | (3.9) |
| **Equity Value** | $1,307.6 | $1,434.9 | $1,696.6 |
| **Proceeds To:** | | | |
| WP (Excluding Dividend) | $652.5 | $712.5 | $836.0 |
| Management A-1 (Excluding Dividend to Crowe) | $19.9 | $21.6 | $25.0 |
| A-2 Holders and C Units | $469.3 | $509.4 | $592.0 |
| Management B | $165.8 | $191.3 | $243.6 |

---

[162] JX 183.0003–05.

[163] *Id*. at .0003.

[164] *Id*. at .0005; Lydecker Tr. 406 (noting "Management B" represents the B Pool); JX 184 at Tab "Exit Scenarios."

The resulting hypothetical B Pools were $165.8 million using no-brainer adjustments, $191.3 million using moderate adjustments, and $243.6 million using all adjustments.[165]

### G. GP Issues The Remaining B Units At A $110.7 Million Threshold Value.

On February 28, 2022, GP issued the remaining 612,700 B Units at a Threshold Value of $110.7 million.[166] GP established that Threshold Value using its December 31 Valuation.[167] GP had sent Tinsley and Lydecker undated RUAs indicating the $110.7 million Threshold Value on February 24.[168]

The new Threshold Value set the upper bound of the second B Pool tier and the lower bound of the third and final tier. As a result, the second tier would extend from $16.8 million to $110.7 million, reserving $93.9 million in B Pool proceeds for second-tier unitholders.[169] Walker did not receive any more B Units, so his share of the third tier fell to 12%.[170]

---

[165] JX 183.0005.

[166] *See* PTO ¶ 39.

[167] JX 265; Dimitrief Tr. 298–99, 311; JX 175 at Tab "Unit Valuation Summaries 2021," Column M.

[168] JX 166; JX 167.

[169] $110,700,000 – $16,800,000 = $93,900,000.

[170] *See* PTO ¶¶ 41, 44.

## H. The Partners Group Transaction

TA did not buy FRP. Instead, on August 9, 2022, it was announced that private equity firm Partners Group had agreed to acquire a controlling stake in FRP from Warburg.[171] Partners Group invested at a $2.83 billion enterprise value, which represented a 17.8x multiple over LTM EBITDA and implied a B Pool of $223 million.[172] That crystallized the B Pool's third and final tier. The finalized B Pool structure based on the Partners Group transaction was as follows:

| Tier | Number of Units | Tier Lower Bound | Tier Upper Bound | Available Proceeds |
|------|----------------|------------------|------------------|--------------------|
| #1 | 2,297,300 | $0 | $16,800,000 | $16,800,000 |
| #2 | 2,387,300 | $16,800,000 | $110,700,000 | $93,900,000 |
| #3 | 3,000,000 | $110,700,000 | $223,000,000 | $112,300,000 |
| | | | **Total Available Proceeds** | **$223,000,000** |

Walker's 360,000 units represented about 15.67% of first-tier units,[173] 15.08% of second-tier units,[174] and 12% of third-tier units.[175] So Walker received 15.67% of

---

[171] JX 246; JX 247.

[172] *See* JX 243.0003; JX 246; JX 247; PTO ¶ 43.

[173] 360,000/2,297,300 ≈ 0.1567.

[174] 360,000/2,387,300 ≈ 0.1508.

[175] 360,000/3,000,000 = 0.12.

first-tier proceeds, 15.08% of second-tier proceeds, and 12% of third-tier proceeds. The parties agree Walker received $30,329,705 for his B Units.[176]

## I. Procedural History

Walker claims GP breached Section 3.2(c)(iii) of the LPA when it used the December 31 Valuation to establish the February 2022 Threshold Value.[177] Walker contends he did not receive all the B Pool proceeds he should have.[178] He filed this lawsuit against GP on September 15, 2022.[179] Count I alleges GP breached the LPA by failing to make a reasonable determination of the Fair Market Value of the Partnership's assets when it assigned a $110.7 million Threshold Value to the B Units issued on February 28, 2022.[180] Count II alleges a breach of the implied

---

[176] *See* Walker Op. Br. 33; GP Ans. Br. 40.

Applying Walker's percentages to the proceeds at each tier suggests Walker should have received around $30.27 million. The discrepancy is likely due to the parties' stipulation that the final B Pool was $223 million, which appears to be a rounded number, or possibly the size of the B Pool before a post-closing true-up. *See* PTO ¶ 43 (stipulating the B Pool was $223 million); Walker Op. Br. 56 (suggesting the B Pool was $223,509,333); GP Ans. Br. 14 (rounding the B Pool to $224 million); *cf.* Tinsley Tr. 691 (discussing differences in a hypothetical B Pool depending on whether a true-up was accounted for); JX 169 (exhibit referenced in Tinsley's testimony regarding a hypothetical true-up). I will proceed as if the B Pool was $223 million and Walker received $30,329,705.

[177] Walker Op. Br. 42–45.

[178] *Id.* at 54–56.

[179] D.I. 1 [hereinafter "Compl."].

[180] *Id.* ¶¶ 49–53.

covenant of good faith and fair dealing.[181]  Trial was held from June 11 through 13, 2024,[182] and I took the matter under advisement after post-trial argument on October 16.[183]  This opinion concludes GP breached the LPA and awards damages of $416,248.93, plus pre- and post-judgment interest.

## II.    ANALYSIS

Walker advances claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  I begin with his express breach of contract theory.  "Under Delaware law, a breach of contract claim comprises three elements: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages."[184]

"Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[185]  The Court reads the "contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."[186]  "When interpreting a contract, the Court will give priority to the

---

[181] *Id.* ¶¶ 54–59.

[182] D.I. 69.

[183] D.I. 83.

[184] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *9 (Del. Ch. July 6, 2018).

[185] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[186] *Id.* (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393 (Del. 2010)).

parties' intentions as reflected in the four corners of the agreement."[187] "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[188] "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[189] The party asserting a contract breach "bears the burden of proof and must meet that burden by a preponderance of the evidence."[190] "[A]nd a party asserting an affirmative defense bears the burden of proof."[191]

### A. GP Breached The LPA When It Set A $110.7 Million Threshold Value.

Walker argues GP's February 2022 Threshold Value determination violated Section 3.2(c)(iii) of the LPA. The LPA grants broad discretion to GP to manage the business.[192] That encompasses the discretion to issue additional B Units whenever and to whomever it chooses, subject to a 3,000,000-unit cap.[193] Once GP decides to issue additional B Units, Section 3.2(c)(iii) of the LPA requires it to

---

[187] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

[188] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[189] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

[190] *Desktop Metal, Inc. v. Nano Dimension Ltd.*, 2025 WL 904521, at *22 (Del. Ch. Mar. 24, 2025).

[191] *Id.*

[192] LPA § 8.1(a).

[193] *Id.* §§ 8.1(a), 3.2(a), (c)(i).

determine a Threshold Value for the B Pool and establishes parameters for that determination.[194]   In setting the Threshold Value, GP must make a "reasonable determination" of the amount that would be distributed to the B Unit holders if "immediately prior to the issuance," the Partnership's assets were sold for their "Fair Market Values."[195]   Under the LPA, Fair Market Value means "a determination reasonably made" of the amount "that would be obtained in a negotiated, arm's length transaction between an informed and willing buyer and an informed and willing seller."[196]

The specific provisions governing Threshold Value—Section 3.2(c)(iii) and the definition of Fair Market Value—cabin the LPA's general grant of discretion to GP.[197]  Their plain text establishes several nested requirements.  First, it requires GP to make a reasonable determination of FRP's enterprise value.[198]  Second, that determination must reflect enterprise value immediately prior to the issuance.  And third, that enterprise value must reflect Fair Market Value—*i.e.*, the amount FRP

---

[194] *Id.* § 3.2(c)(iii).

[195] *Id.*

[196] *Id.* Ex. A.

[197] *See DCV Hldgs.*, 889 A.2d at 961; *S'holder Representative Servs. LLC v. Alexion Pharms., Inc.*, 2024 WL 4052343, at *15, *36–37 (Del. Ch. Sept. 5, 2024) (determining that a contract's grant of sole discretion was cabined by a specific provision requiring commercially reasonable efforts).

[198] LPA § 3.2(c)(iii).

35

would fetch in a negotiated, arm's length transaction between informed and willing parties.[199]

The parties disagree over the proper interpretation of the immediacy requirement. GP argues "the term 'immediate' is in the eye of the beholder and that [GP] retained discretion to be that 'eye' and determine that 'immediate' would be defined as quarterly during the relevant timeframe."[200] GP presses it "relied on the regularity of the periodic valuation process" to satisfy the requirement.[201] Walker argues the immediacy requirement is "strict and unambiguous."[202] He points to Black's Law Dictionary, which defines "immediately" as "[w]ithout delay; instantly, directly, or straightaway."[203] But the same entry in Black's Law Dictionary notes that "[i]n temporal terms, the sense of immediately can vary according to context."[204]

---

[199] While the definition of "Fair Market Value" has its own reasonableness requirement, GP's determination under Section 3.2(c)(iii) must itself be reasonable. I do not see how Fair Market Value's own reasonableness requirement could add an additional layer of reasonableness for purposes of a Section 3.2(c)(iii) determination. The contract must be viewed as a whole. Other provisions besides Section 3.2(c)(iii) reference Fair Market Value, but do not contain an overarching reasonableness requirement as Section 3.2(c)(iii) does. *E.g.*, *id.* § 12.2(c)(ii). The reasonableness requirement in the definition of Fair Market Value comes into play in those contexts. This construction does not implicate the rule against surplusage.

[200] GP Ans. Br. 26.

[201] *Id.* at 20.

[202] Walker Reply Br. 5.

[203] *Id.* at 5 (quoting *Immediately*, Black's Law Dictionary (12th ed. 2024)).

[204] *Immediately*, Black's Law Dictionary (12th ed. 2024).

Following that plain meaning, and Delaware law's commandment to read the LPA as a whole,[205] I look to the remainder of the LPA for context. The LPA defines each B Unit as a Profits Interest within the meaning of Revenue Procedures 93-27 and 2001-43.[206] Section 3.2(c)(iii) requires GP to set a Threshold Value for newly issued B Units "to the extent necessary to cause such . . . B Units to constitute Profits Interests."[207] Revenue Procedure 93-27 defines a profits interest in contrast to a capital interest that would, "at the time of receipt," "give the holder a share of the proceeds if the partnership's assets were sold at fair market value and then the proceeds were distributed in a complete liquidation."[208] The IRS generally "will not treat the receipt of [a profits] interest as a taxable event," as compared to capital interests that are taxable as compensation.[209] So to constitute a profits interest as required under the LPA, a B Unit must be expected to receive nothing from the waterfall on the day it is issued; otherwise, the B Unit would give the holder a taxable share of the proceeds in a liquidation event at the time of issuance.[210] In other words,

---

[205] *Osborn*, 991 A.2d at 1159; *see also JER Hudson GP XXI LLC v. DLE Invs., LP*, 275 A.3d 755, 784 n.173, 799–800 (Del. Ch. 2022) (construing LPA as a whole).

[206] Rev. Proc. 93-27, 1993-2 C.B. 343; Rev. Proc. 2001-43, 2001-2 C.B. 191.

[207] LPA § 3.2(c)(iii).

[208] Rev. Proc. 93-27, § 2, 1993-2 C.B. 343.

[209] *Id.* §§ 3–4.

[210] *See* LPA §§ 3.2(c)(iii), 6.1(c).

the B Unit's Threshold Value must be equal to (or perhaps greater than[211]) the size of the B Pool implied by a fair market value sale on the day of issuance. This supports a very proximate valuation. The immediacy requirement requires GP to determine enterprise value as close in time as possible to the issuance.

GP based the $110.7 million Threshold Value on the December 31 Valuation, a quarterly valuation performed two months before the February 28, 2022, issuance—far from immediately before.[212] That Valuation valued FRP at $2.098 billion, a 16x multiple over $131.1 million in adjusted pro forma EBITDA.[213] Between the December 31 Valuation and the February 2022 issuance, Warburg updated its view on QoE adjustments based on an analysis it commissioned from Ernst & Young.[214] That drove a sizable increase in Warburg's view of enterprise value. By February 11, Warburg's "least aggressive" view of adjusted EBITDA— informed by Ernst & Young's analysis—was $137.6 million.[215] Assuming the same

---

[211] Neither party suggests the Threshold Value should be greater than the B Pool implied by GP's reasonable determination of enterprise value. But as a matter of logic, such a Threshold Value would not seem to disqualify a B Unit as a profits interest under Revenue Procedure 93-27. A given B Unit does not receive proceeds from the B Pool until the B Pool exceeds the unit's Threshold Value. *See id.* § 6.1(c); Walker Tr. 34, 43–46, 53.

[212] JX 265; Dimitrief Tr. 298–99, 311; *see* JX 175 at Tab "Unit Valuation Summaries 2021," Column M.

[213] JX 175 at Tab "Unit Valuation Summaries 2021," Cells M34–M36.

[214] JX 99.0005; JX 130; Dimitrief Tr. 249; JX 148.0002.

[215] *See* JX 182.0001–02; JX 189.0004; Dimitrief Tr. 249; JX 130; Beach Tr. 609; JX 148.0002; JX 184 at Tab "Imp. Multiples & Adjustments," Cells G11, G17, G23, G27, G28, G29; JX 154.0002; Stein Tr. 805–06; JX 152.0001; JX 183.0002.

16x multiple from the December 31 Valuation, that implies a $2.202 billion enterprise value,[216] a $100 million increase over the December 31 Valuation. The December 31 Valuation did not satisfy Section 3.2(c)(iii)'s immediacy requirement.

The remaining requirements flow from Section 3.2(c)(iii)'s use of the defined term Fair Market Value.[217] That definition's plain meaning controls: the Threshold Value must be derived from a reasonable determination of the value the Partnership's assets would sell for in a negotiated, arm's length transaction between informed and willing parties.[218]

The December 31 Valuation approximated neither a "negotiated" transaction nor an "informed" transaction as Fair Market Value requires. The Valuation did not approximate a negotiated transaction because its QoE adjustments ($4.3 million) did not approach even Warburg's February "no-brainer" adjustments ($6.4 million).[219] Warburg would not have settled for QoE adjustments below its "no-brainer" adjustments in a negotiated sale.[220] Warburg's practice of using quarterly valuations

---

[216] $137,600,000 x 16 ≈ $2,202,000,000.

[217] LPA § 3.2(c)(iii), Ex. A.

[218] *Id.*

[219] *See* JX 175 at Tab "Unit Valuation Summaries 2021," Cells M11, M16, M18; Dimitrief Tr. 194–95, 318–19; JX 183.0003.

[220] *See* JX 152.0001.

39

to set A-2 Unit prices unilaterally, without any opportunity for negotiation, does not help its case.[221]

The Valuation did not approximate an informed transaction because it failed to account for new information GP knew. By February 11, Warburg had received the QoE analysis it commissioned from Ernst & Young.[222] Informed by that analysis, Warburg's "least aggressive" QoE adjustments were $12.3 million (up from $4.3 million in the December 31 Valuation).[223] Warburg also had new information on LOIs, causing LOI credit to decrease from $8.7 million in the December 31 Valuation to $6.3 million by February 11.[224]

GP did not satisfy the LPA's requirements for a reasonable determination of enterprise value. According to Warburg's trial testimony, GP used the December 31 Valuation reflexively out of its commitment to the "law of one price," i.e., "the use of the same enterprise value to calculate unit price for all contemporaneously

---

[221] See Stein Tr. 785–86; Lydecker Tr. 376–77.

[222] See Dimitrief Tr. 249; JX 130; Beach Tr. 609; see also JX 182.0002; JX 148.0002.

[223] See JX 182.0002; JX 148.0002; Dimitrief Tr. 249; JX 130; Beach Tr. 609; JX 175 at Tab "Unit Valuation Summaries 2021," Cells M11, M16, M18.

[224] See JX 175 at Tab "Unit Valuation Summaries 2021," Column M, Cell M30; JX 182.0001–.0002; JX 189.0004; JX 184 at Tab "Imp. Multiples & Adjustments," Cells G11, G17, G23, G27, G28, G29; JX 154.0002–03; Stein Tr. 805–06; JX 150.0002; JX 183.0002. Walker might not object to that error, but it was still uninformed.

Base EBITDA increased from approximately $118 million in the December 31 Valuation to $119 million in February 2022, possibly due to better information. But the record is unclear about the reason for that increase. JX 175 at Tab "Unit Valuation Summaries 2021," Cells M9, M10, M28, M29; Dimitrief Tr. 318–19; JX 182.0002.

40

issued classes of units."[225]  That principle has no home in the LPA and is no basis for GP to ignore its obligations under Section 3.2(c)(iii).[226]

GP raises four counterarguments.  First, GP argues that because the LPA grants GP operational discretion and authorizes GP to consider only its own interests when making determinations, GP has discretion to determine the immediacy requirement's demands.[227]  That argument writes Section 3.2(c)(iii)'s immediacy requirement and Profits Interests definition out altogether.[228]  Taken to its logical conclusion, that would afford GP the discretion to use a valuation of any age, so long as GP thought it was timely enough.

Second, GP points out that the LPA excludes unitholders from participating in the valuation process:  the LPA offers no dispute resolution mechanism to challenge GP's "final and binding" determination of Fair Market Value, whereas RUAs allow unitholders to challenge GP's valuations related to the repurchase of units.[229]  GP contends the lack of a dispute resolution mechanism reflects its

---

[225] GP Ans. Br. 17; Dimitrief Tr. 168, 288–91, 298–99; *see also* GP Ans. Br. 4, 10, 33, 58 (arguing "[GP]'s conduct in relying on the law of one price and its methodology used to perform valuations was reasonable and timely").

[226] LPA § 3.2(c)(iii).

[227] *See* GP Ans. Br. 25–28; LPA §§ 8.1(a), 9.1 (b).

[228] *See Osborn*, 991 A.2d at 1159.

[229] GP Ans. Br. 11–12, 30–32; JX 5.0006; LPA § 3.2(c)(iii), Ex. A; Dimitrief Tr. 282–83.

"complete discretion" over the Threshold Value determination.[230]  But the LPA's definitions of Threshold Value and Fair Market Value constrain GP's discretion regardless of whether and how a unitholder can challenge the determination.  The LPA's lack of a unitholder challenge mechanism does not excuse GP from the contract's requirements for that decision.

Third, GP contends two 2022 transactions demonstrate the December 31 Valuation satisfies the "arm's length" requirement.  First, GP points to a February 2022 acquisition using A-2 Units valued based on the December 31 Valuation.[231]  Next, GP points to its repurchase of A Units from a former employee's estate.[232]  But the fact that GP imposed this Valuation in arms-length A Unit transactions does not speak to its propriety in approximating a negotiated purchase price for the Partnership's assets in valuing B Units.[233]  Even if GP's use of the December 31 Valuation was "arm's length," GP still breached the immediacy, negotiated, and informed requirements.

Fourth, GP insists it was compelled to use the December 31 Valuation to determine the Threshold Value under the "law of one price."[234]  It contends

---

[230] GP Ans. Br. 11–12, 30–32.

[231] *Id.* at 18–19.

[232] *Id.* at 19.

[233] LPA § 3.2(c)(iii).

[234] GP Ans. Br. 10, 17, 33.

abandoning the "law of one price" would create inequities among asset classes.[235]

Even if GP believed its investors expected it to adhere to this principle, GP is bound

by the LPA's terms.[236]   The Threshold Value is not contractually tied to the last

quarterly valuation or the last issuance of A Units.   It is tied to GP's reasonable

determination of enterprise value immediately prior to the issuance of additional B

Units.[237]   By setting a Threshold Value based on an outdated enterprise valuation,

GP breached Section 3.2(c)(iii) of the LPA.

### B.    GP's Affirmative Defenses Fail.

GP pled five affirmative defenses to Walker's claims:  estoppel, acquiescence,

waiver, the business judgment rule, and mootness.[238]   GP's post-trial brief did not

---

[235] *Id.* at 17.

[236] The trial record does not contain any contemporaneous evidence of GP invoking the "law of one price."   Rather, the record contains much handwringing about what Walker would take in an exit event, cogitation on how to freeze his B units, and a failed effort to cap Walker's B Pool stake through an amended employment agreement.   JX 89.0001; JX 88; Tinsley Tr. 654–55, 670, 667–78; JX 92; JX 94; JX 103; Dimitrief Tr. 256–57, 266–67; JX 105; JX 141 § 3(a)–(b); JX 126; Walker Tr. 31, 37–38, 42.  Issuing the remaining B Units to recipients other than Walker, and using the December 31 Valuation to set that issuance's Threshold Value, reduced Walker's stake in the B Pool.  *See* Tinsley Tr. 654–55; LPA § 6.1(c).

[237] LPA § 3.2(c)(iii).

[238] D.I. 10 at 29–30.

raise its waiver, business judgment rule, and mootness defenses, thereby waiving those defenses.[239] GP did not prove estoppel or acquiescence at trial.

### 1. Estoppel

"In general, equitable estoppel is available 'when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment.'"[240] The party asserting an estoppel defense must show she "lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; relied on the conduct of the party against whom estoppel is claimed; and suffered a prejudicial change of position as a result of his reliance."[241]

---

[239] *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *37 n.291 (Del. Ch. July 21, 2017), *aff'd*, 184 A.3d 1291, (Del. 2018); *see Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

GP's pre-trial brief argues more generally that "Walker's conduct, both during his term of service as CFO, when reviewing or relying on financial numbers and reporting to investors, and more importantly when filing his own personal gift tax return with the Internal Revenue Service, should preclude the grant of any relief from this Court." D.I. 53 at 26. GP supported that contention by reference to the maxim of Delaware law that "he who seeks equity must do equity." *Id.* at 25–26. This argument was not briefed after trial, so it too is waived. *See generally* GP Ans. Br. In any case, Walker does not seek equitable relief, only damages, so the maxim on which GP staked its argument is inapplicable. *See* PTO at 12; *Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *7 (Del. Ch. Feb. 25, 2014), *aff'd*, 105 A.3d 989 (Del. 2014); *Fitzgerald v. Fitzgerald Home Farm, LLC*, 2021 WL 1514385, at *2 (Del. Ch. Apr. 16, 2021) (noting damages award for distributions not paid is legal relief).

[240] *Ocean Bay Mart, Inc. v. City of Rehoboth Beach Del.*, 285 A.3d 125, 142 (Del. 2022) (quoting *Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903–04 (Del. 1965)).

[241] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 275 (Del. 2017) (quoting *Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del. 1990)).

The party asserting the defense of estoppel bears the burden of proving the defense by a preponderance of the evidence.[242]

GP contends Walker is "estopped from criticizing [GP]'s valuation methodology based upon his repeated affirmations of the methodology."[243] GP cites the fact that as CFO, "Walker was routinely asked to present to investors many details concerning the valuations performed by [GP]."[244] GP also contends it "relied on [] Walker . . . to provide data that was used in its valuation work."[245] That is insufficient to meet GP's burden to prove detrimental reliance. First, relying on Walker's data for quarterly valuations is different than relying on Walker's conduct for the legitimacy of using those valuations to set Threshold Values. Second, Walker served as CFO only before the Leonard issuance—*i.e.*, "the only time there was a threshold determination made" before the February 2022 issuance.[246] Walker did not learn about the Leonard issuance until more than a year later.[247] GP has not provided any evidence that Walker contributed to GP's methodology for Threshold Value determinations, or that GP relied on him.

---

[242] *In re Coinmint, LLC*, 261 A.3d 867, 894–95 (Del. Ch. 2021).

[243] GP Ans. Br. 33.

[244] *Id.* at 49.

[245] *Id.* at 48.

[246] Walker Tr. 93.

[247] *Id.* at 30–31, 100–01, 103.

GP also argues Walker is estopped from challenging the February 2022 Threshold Value because of "his own representation to the . . . Internal Revenue Service when filing a contemporaneous gift tax return representing a value materially less than the enterprise valuation he complains of."[248] Walker filed a 2021 gift tax return in connection with the transfer of A Units to family trusts using a valuation performed by an independent firm.[249] But that valuation was not subject to LPA Section 3.2(c)(iii), which only governs how GP must value B Units when issued.[250] Walker's use of an independent valuation in his gift tax return did not imply that the same valuation, or even a higher valuation, was appropriate for purposes of a Threshold Value determination. And GP has not shown the unlikely fact that it relied on Walker's representations in the gift tax return as support of its methodology for determining Threshold Values. GP has not proven estoppel.

### 2. Acquiescence

"The doctrine of acquiescence effectively works an estoppel: where a plaintiff has remained silent with knowledge of her rights, and the defendant has knowledge of the plaintiff's silence and relies on that silence to the defendant's detriment, the plaintiff will be estopped from seeking protection of those rights."[251] "The party

---

[248] GP Ans. Br. 33.

[249] JX 161; JX 65; Dimitrief Tr. 201; Walker Tr. 119, 125–26.

[250] *See* LPA § 3.2(c)(iii).

[251] *Lehman Bros.*, 2014 WL 718430, at *9.

invoking the defense of acquiescence must prove that the party asserting the claim 'by words or deed, has acknowledged the legitimacy of the defendants' conduct.'"[252] "For the defense of acquiescence to apply, conscious intent to approve the act is not required, nor is a change of position or resulting prejudice."[253] The party asserting the affirmative defense of acquiescence must prove the defense by a preponderance of the evidence.[254]

GP argues Walker acquiesced to its valuation methodology by failing to object to its valuations during his tenure as CFO.[255] But during that time, GP's valuations were only used for A Units, which are not subject to Section 3.2(c)(iii)'s valuation requirements or any other valuation requirements under the LPA.[256] Walker's silence regarding GP's A Unit valuations did not acknowledge the legitimacy of GP's process for valuing B Units. Before the February 2022 issuance, the Leonard issuance in October 2020 was "the only time there was a threshold determination made" for B Units.[257] GP did not inform Walker of that issuance, and Walker was

[252] *XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 623 (Del. Ch. 2022) *aff'd in part, rev'd in part on other grounds*, 304 A.3d 896 (Del. 2023) (quoting *Clements v. Rogers*, 790 A.2d 1222, 1238 n.46 (Del. Ch. 2001)).

[253] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (footnote omitted).

[254] *VH5 Cap., LLC v. Rabe*, 2023 WL 4305827, at *20 (Del. Ch. June 30, 2023).

[255] GP Ans. Br. 4, 33; D.I. 10 at 30; PTO at 10.

[256] *See* Walker Tr. 34–35, 93–94; D.I. 85; *see generally* Walker Op. Br.; GP Ans. Br.

[257] Walker Tr. 93.

not aware of it until more than a year later.[258] So GP could not have relied on Walker's silence as acknowledging the legitimacy of its Threshold Value methodology.[259] GP has not proven acquiescence.

## C. Walker's Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing

Walker presented an alternative claim for breach of the implied covenant of good faith and fair dealing.[260] As I have found GP breached its express obligation to make a reasonable determination of Threshold Value when it issued the remaining B Units, I do not reach Walker's implied covenant claim. Count II is moot.[261]

## D. Damages

Walker has proven GP breached LPA Section 3.2(c)(iii). "Under Delaware law, the standard remedy for breach of contract is based on the reasonable

---

[258] *Id.* at 30–31, 100–01, 103.

[259] GP also points to Walker's failure to object to GP's use of the December 31 Valuation in the 2022 A Unit transactions. *See* GP Ans. Br. 18–19, 50–51. Again, the Valuation's use in transactions not implicating LPA Section 3.2(c)(iii) does not speak to its propriety for setting a Threshold Value. GP could not have reasonably relied on Walker's silence with respect to these transactions, and has submitted no evidence it did.

[260] Compl. ¶¶ 54–59; D.I. 85 at 40 (representing that the implied covenant claim "is an alternative argument").

[261] *Wilmington Sav. Fund Soc'y, FSB v. Foresight Energy LLC*, 2015 WL 7889552, at *10 (Del. Ch. Dec. 4, 2015) ("The Trustee is entitled to relief under the express language of the Indenture, rendering it unnecessary to consider implied obligations. [The implied covenant count] is moot."); *see Vivint Solar, Inc. v. Lundberg*, 2024 WL 2755380, at *38 (Del. Ch. May 30, 2024).

expectations of the parties that existed before or at the time of the breach."[262] "This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract."[263] Here, expectation damages are the difference between Walker's actual payout and the payout he would have received had GP fulfilled its contractual obligation to determine a Threshold Value immediately before the February 28, 2022, B Unit issuance.

As an initial matter, although the December 31 Valuation does not satisfy Section 3.2(c)(iii)'s immediacy requirement, that requirement does not necessarily mandate that GP determine Fair Market Value on the day of issuance. GP distributed RUAs on February 24, four days before the issuance that declared a Threshold Value of $110.7 million.[264] In context, this is "immediately prior to the issuance," in compliance with the LPA. I will assess damages based on GP's reasonable determination of Fair Market Value on those RUAs' mailing date of February 24.

The expert opinions presented in this case do not squarely address the question of damages—even assuming they are valid estimates of enterprise value on February

[262] *PharmAthene, Inc. v. Siga Techs., Inc.*, 2014 WL 3974167, at *7 (Del. Ch. Aug. 8, 2014), *aff'd* 132 A.3d 1108 (Del. 2015).

[263] *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001).

[264] JX 166; JX 167.

24—because they are not tethered to GP's view of Fair Market Value.[265] The LPA does not define Threshold Value in reference to an objective determination of FRP's enterprise value.[266] It defines Threshold Value as the "amount that would, in the reasonable determination of [GP]," be distributed to B Unit holders if FRP were sold at Fair Market Value, *i.e.*, GP's reasonable determination of enterprise value based on a hypothetical negotiated, arm's length transaction between informed and willing parties.[267] That language sets Walker's contractual expectation. Putting Walker in the position he would have been in absent GP's breach requires evaluating GP's reasonable determination of enterprise value.

Walker's expert was tasked with assessing FRP's fair market value when GP issued the remaining B Units, determining the corresponding Threshold Value, calculating damages based on his conclusion, and opining on the reasonableness of GP's Threshold Value determination.[268] He used multiple valuation approaches to do so.[269] But each one assessed enterprise value based on his own opinion, divorced from Section 3.2(c)(iii)'s requirement to base Threshold Value on GP's reasonable

---

[265] *See* JX 290; JX 291; JX 292; JX 293; JX 294; LPA § 3.2(c)(iii).

[266] *See* LPA § 3.2(c)(iii).

[267] *Id.* at § 3.2(c)(iii), Ex. A.

[268] Kleinrichert Tr. 411, 417; *see* JX 290 ¶ 9 (stating the task was to determine "fair market value").

[269] Kleinrichert Tr. 419–20.

determination.[270] Walker's expert stated he "considered the methodologies that [he] thought would be most appropriate to come to the value of FRP"[271] and reported "[his] conclusion of the enterprise value."[272] As for GP's expert, he did not opine on GP's view of Fair Market Value except to conclude that GP's use of the December 31 Valuation was reasonable, which as explained it was not.[273] Neither expert opinion was helpful to the Court in assessing damages, so I do not consider them.[274]

Charged with the task of reconstructing GP's determination, I believe Warburg's February 26 Grills model is the best starting point for GP's view of Fair Market Value on February 24. The Grills model is Warburg's "internal" view representing its "best guess" about FRP's future.[275] GP argues the Grills model is too forward-looking, while the December 31 Valuation assessed FRP's value at the moment it was performed.[276] But the December 31 Valuation is also

[270] *Id.* at 419–20, 441–42, 486 ("I mean, ultimately, I used the methodologies that I -- that I came to based on my research. My opinions were derived from the market and the income approach.").

[271] *Id.* at 419.

[272] *Id.* at 486.

[273] Beach Tr. 524–26.

[274] D.R.E. 702; *In re Del. Pub. Schs. Litig.*, 239 A.3d 451, 500–01 (Del. Ch. 2020) (citing *Bowen v. E.I. DuPont de Nemours & Co.*, 906 A.2d 787, 794 (Del. 2006)).

[275] Dimitrief Tr. 303, 339.

[276] *See* Stein Tr. 802; Dimitrief Tr. 339–40.

forward-looking:  it includes $8.7 million in upward adjustments for LOI credit.[277]

And a forward-looking model may still capture GP's view of what would be obtained in an informed and willing negotiation.  Stein suggested a willing seller would allow adjustments for future acquisitions with LOIs.[278]  The Grills model is not too forward-looking to serve as the starting point in assessing GP's view of Fair Market Value.

But perhaps to GP's point, the Grills model requires adjustments to align it with GP's contemporaneous view, as proven by the preponderance of the evidence. Most importantly, the 18x multiple in the Grills model must be reduced to 16x.  Trial showed that the 18x multiple was meant to facilitate TA's preemptive bid to gain exclusivity in negotiations.[279]  TA presented it for shock and awe, and Warburg never viewed it as serious.[280]  Walker has not introduced evidence that Warburg would have used a greater multiple than the 16x multiple used in the December 31 Valuation.[281]

---

[277] JX 175 at Tab "Unit Valuation Summaries," Cell M30; Dimitrief Tr. 194–95, 318–19.

[278] Stein Tr. 805–06.

[279] JX 99.0002; D.I. 61, Jackson Dep. 121; Dimitrief Tr. 207–08, 211, 244–45, 277.

[280] JX 99.0002; D.I. 61, Jackson Dep. 121; Dimitrief Tr. 207–08, 211, 244–45, 277.

[281] JX 175 at Tab "Unit Valuation Summaries 2021," Cell M35.

Additionally, the Grills model's LOI credit adjustment includes $4 million for deals not under LOI.[282] Those deals were included in the Grills model not because they represented a legitimate adjustment to EBITDA at that moment, but because Warburg expected that if it ever finalized a transaction with TA, those deals would have LOIs in place by that point.[283] Warburg believed an accurate LOI credit adjustment was $6.3 million.[284]

Finally, the Grills model presents three levels of QoE adjustments: "no-brainer adjustments," "moderate adjustments," and "all adjustments."[285] The model provides $6.4 million in no-brainer adjustments, $13.4 million in moderate adjustments, and $28 million for "all adjustments."[286] Walker's post-trial briefing advancing the Grills model only contemplates using the moderate adjustments.[287] I agree the moderate adjustments best approximate GP's view. First, Warburg believed it was entitled to some QoE adjustments.[288] In a negotiated sale, Warburg

[282] JX 184 at Tab "2021,2022 Equity Valuation," Cells Z16–Z18.

[283] Stein Tr. 805–06.

[284] See JX 150.0002–03; JX 182.0002–03; JX 183.0002; JX 184 at Tab "2021,2022 Equity Valuation," Cells Z10–Z12, Z15.

[285] JX 183.0003.

[286] Id.

[287] See Walker Op. Br. 54; JX 183.0005; JX 188.0009.

[288] See JX 152.0001.

would naturally push for more adjustments, and indeed it did so in talks with TA.[289] The buyer would naturally push for fewer. Warburg's own middle ground is an intuitive starting point for its own determination of which adjustments a willing buyer and seller would agree to.

The preponderance of the evidence indicates the $6.4 million in no-brainer adjustments would be below GP's reasonable determination. GP appears to have conceived of the no-brainer level only after TA's written bid. In earlier discussions about the written bid on February 25, Stein referred to $12.3 million in adjustments as Warburg's "least aggressive" adjustments.[290]

I conclude the Grills model's moderate QoE adjustments are appropriate with one caveat. When Warburg shifted from describing its "least aggressive" adjustments to break out "no-brainer" and "moderate" adjustments, Warburg appears to have added a $1.1 million adjustment for "2021 Net New Business Adjustment" to the moderate adjustments.[291] That adjustment must be removed from the Grills model to align it with Warburg's moderate view of $12.3 million in QoE

---

[289] *See id.*

[290] *See* JX 189.0004.

[291] JX 182.0001–02; JX 189.0004; Dimitrief Tr. 192–95, 293–94; Leonard Tr. 741–42.

adjustments when it determined the remaining B Units' Threshold Value. The remaining Grills model inputs need no adjustment.[292]

From there, calculating Walker's damages requires three steps: (1) determining the appropriate Threshold Value based on the Grills model, as adjusted in accordance with this opinion; (2) calculating what Walker's B Pool payout should have been using that Threshold Value for the February 2022 issuance; and (3) calculating the difference between what Walker should have received and his actual B Pool payout.

---

[292] The remaining inputs convert enterprise value to equity value. They are cash on the balance sheet, debt, net present value of earnout liabilities, purchase price for deals under LOI, loan repayments due from certain equity holders, and bonus payments due to certain synthetic equity holders. Dimitrief Tr. 189–90, 195–96; JX 184 at Tab "2021,2022 Equity Valuation." Cash, debt, and net present value of earnout liabilities are relatively objective figures, which had remained consistent in GP's models since December 17. *See* JX 93 at Tab "Unit Valuation Model," Cells H40–H42 (showing the same values on December 17); *see also* JX 129 at Tab "2021 Equity Valuation," Cells H13–H15 (showing the same values on January 27); JX 158.0001 (showing the same values on February 15); Dimitrief Tr. 190 ("The key line items there were debt, right. So we had to pay back the obligations to our debt holders. You get cash that was on the balance sheet, right. . . . And then the other big line item is something called earnout liabilities. . . . As it relates to earnout obligations, these are future obligations of the company that if the company was sold today a buyer would need to pay. From that perspective, any reasonable buyer would expect these to be liabilities of the seller."). Those figures represent GP's reasonable determination.

The adjustments for loan repayments and bonus payments had also been fairly consistent since December 17, 2021. *See* JX 93 at Tab "Unit Valuation Model," Cells Q44, Q46; *see also* JX 158.0001 (showing the same values on February 15); JX 175 at Tab "Unit Valuation Summaries," Cells M43, M45 (showing similar numbers for the December 31 Valuation). Finally, the purchase price adjustment for deals under LOI does not need to be altered because when the future acquisitions without LOIs are removed, the Grills model automatically updates both LOI Credit and the purchase price adjustment for deals under LOI. *See* JX 184 at Tab "2021,2022 Equity Valuation."

I have adjusted the Grills model inputs on the native spreadsheet in the trial record to reduce the multiple from 18x to 16x, remove the deals without LOIs, and remove the "2021 Net New Business Adjustment" from the moderate QoE adjustments.[293] The model provides the appropriate Threshold Value for the February 2022 issuance (contained in a cell labeled "Management B").[294] Below is a side-by-side comparison of the Grills model before my modifications (left) and after modifications (right)[295]:

---

[293] *See* JX 184 at Tab "2021,2022 Equity Valuation," Cell J11 (changing the cell value from "18" to "16" to reflect a 16x multiple); *id.* at Tab "2021,2022 Equity Valuation," Cells Z16–Z18 (changing cell values to "0" to reflect no LOI credit for targets without LOIs in place); *id.* at Tab "Imp. Multiples & Adjustments," Cell U18 (changing value from "1" to "0" to remove $1.1 million in "2021 Net New Business Adjustment" from the model's set of moderate QoE adjustments); *id.* at Tab "2021,2022 Equity Valuation," Cell J25 (observing "Management B" of $126.2 million, reflecting the Grills model's Threshold Value output after modifications).

[294] Lydecker Tr. 406 (noting "Management B" represents the B Pool).

[295] *See* JX 184 at Tab "2021,2022 Equity Valuation."

| Illustrative Equity Value | | Illustrative Equity Value | |
|---|---:|---|---:|
| *($ in millions)* | **2021** | *($ in millions)* | **2021** |
| **Valuation** | | **Valuation** | |
| Base EBITDA | $119.0 | Base EBITDA | $119.0 |
| (+) QoE Adjustment | $13.4 | (+) QoE Adjustment | $12.3 |
| (+) 2022 LOI Credit | $10.3 | (+) 2022 LOI Credit | $6.3 |
| **Total Adjusted PF EBITDA** | **$142.7** | **Total Adjusted PF EBITDA** | **$137.6** |
| Exit Multiple | 18.0x | Exit Multiple | 16.0x |
| **Total Enterprise Value** | **$2,569.3** | **Total Enterprise Value** | **$2,202.2** |
| (+) Cash | 21.4 | (+) Cash | 21.4 |
| (-) Debt | (939.4) | (-) Debt | (939.4) |
| (-) Earnouts | (111.5) | (-) Earnouts | (111.5) |
| (-) Purchase Price Deduct for Deals under LOI | (107.7) | (-) Purchase Price Deduct for Deals under LOI | (66.2) |
| (+) Producer A-2 Loan Repayment | 6.6 | (+) Producer A-2 Loan Repayment | 6.6 |
| (-) Producer A-3 Sales Incentive Bonus Payment | (3.9) | (-) Producer A-3 Sales Incentive Bonus Payment | (3.9) |
| **Equity Value** | **$1,434.9** | **Equity Value** | **$1,109.3** |
| **Proceeds To:** | | **Proceeds To:** | |
| WP (Excluding Dividend) | $712.5 | WP (Excluding Dividend) | $559.0 |
| Management A-1 (Excluding Dividend to Crowe | $21.6 | Management A-1 (Excluding Dividend to Crowe | $17.3 |
| A-2 Holders and C Units | $509.4 | A-2 Holders and C Units | $406.8 |
| Management B | $191.3 | Management B | $126.2 |

The unadjusted Grills model—using an 18x multiple, full LOI credit, and all the moderate QoE adjustments—implies a $191.3 million Threshold Value. Adjusted for GP's reasonable determination as established by the preponderance of the evidence, the Threshold Value becomes $126.2 million.[296]

That alters the B Pool tiers. The first tier still extends from $0 to $16.8 million, with $16.8 million in available proceeds. The second tier extends from $16.8 million

---

[296] *See id.* at Tab "2021,2022 Equity Valuation," Cell J25 (showing "Management B" of $126.2 million after modifications to the model).

The Grills model's exact output for "Management B" is $126,181,499.19. *See id.* GP rounded the December 31 Valuation's "Management B" output to the nearest hundred thousand in assigning the February 2022 Threshold Value. *See* JX 175 at Tab "Unit Valuation Summaries," Cell M49. I do not question the reasonableness of that rounding determination under LPA Section 3.2(c)(iii). Consistent with GP's reasonable determination, I adopt the same Threshold Value rounding convention here.

to $126.2 million, with $109.4 million in available proceeds. The third tier extends from $126.2 million to $223 million, with $96.8 million in available proceeds.[297]

Walker is entitled to 15.67% of first-tier proceeds, 15.08% of second-tier proceeds, and 12% of third-tier proceeds.[298] Applying those percentages to each tier and eliminating rounding error, Walker's respective payouts from each tier should have been $2,632,655.73, $16,497,298.20, and $11,616,000.00. Summing these amounts, Walker should have received $30,745,953.93 in proceeds from the B Pool. The following table illustrates these calculations:

| Tier | Tier Lower Bound | Tier Upper Bound | Available Proceeds At Each Tier | Walker's Proportion Of Proceeds From Each Tier[299] | Walker's Proceeds From Each Tier |
|---|---|---|---|---|---|
| #1 | $0 | $16,800,000 | $16,800,000 | 360,000/2,297,300 | $2,632,655.73 |
| #2 | $16,800,000 | $126,200,000 | $109,400,000 | 360,000/2,387,300 | $16,497,298.20 |
| #3 | $126,200,000 | $223,000,000 | $96,800,000 | 360,000/3,000,000 | $11,616,000.00 |
| | | | | **Walker's Total Proceeds But For Breach** | **$30,745,953.93** |

---

[297] See LPA §§ 3.2(c)(iii), 6.1(c); Walker Tr. 34, 43–46, 53–54, 105; Tinsley Tr. 675–76; Dimitrief Tr. 230; see also Walker Op. Br. 16–18; GP Ans. Br. 39–40.

[298] See Walker Op. Br. 56; GP Ans. Br. 38; see JX 88; JX 89.0001; Tinsley Tr. 674; Walker Tr. 34–35, 92–93; cf. JX 141 § 3(a); PTO ¶¶ 23–24; LPA § 6.1(c).

[299] 360,000/2,297,300 ≈ 15.67%. 360,000/2,387,300 ≈ 15.08%. 360,000/3,000,000 = 12%.

I have used exact proportions, as opposed to rounded ones, to calculate Walker's proceeds from each tier using the updated Threshold Value.

Walker's actual payout was $30,329,705.[300]  He is entitled to $416,248.93 in damages to make up the difference between his actual payout and what he should have received.[301]

### E.    Pre- and Post-Judgment Interest

GP does not contest Walker's entitlement to pre- and post-judgment interest on his damages award at the legal rate.[302]  Under the modern Delaware approach to pre- and post-judgment interest, courts apply compounding interest, often at quarterly intervals, and floating interest rates.[303]  Quarterly compounding pre- and post-judgment interest applying a floating rate is appropriate here.[304]

## III.   CONCLUSION

Walker is entitled to $416,248.93 in damages for GP's breach of the LPA, plus pre- and post-judgment interest.  The parties shall submit a proposed stipulated final order and judgment implementing this decision within 14 days.

---

[300] *See* Walker Op. Br. 33; GP Ans. Br. 40.

[301] $30,745,953.93 – $30,329,705 = $416,248.93.

[302] *See generally* GP Ans. Br.; Walker Op. Br. 62.

[303] *ITG Brands, LLC v. Reynolds Am., Inc.*, 2025 WL 670818, at *12–14 (Del. Ch. Mar. 3, 2025) (collecting cases).

[304] Walker's post-trial brief states that he "reserves his right to seek indemnification from the Partnership for his attorneys' fees incurred in this matter after trial of the case under section 9.1(d) of the LPA."  Walker Op. Br. 62 n.2.  His brief does not otherwise mention attorneys' fees, so I do not address them here.

59